**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-55 (DLF)** |
| **v.** | : | |
| | : | |
| **MARCOS PANAYIOTOU** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Marcos Panayiotou to 45 days' incarceration followed by 36 months' probation and $500 in restitution.

I.       **Introduction**

Defendant Marcos Panayiotou, a 30-year old former Marine and current independent contractor for his father's pool liner company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on August 26, 2022, (ECF No. 23 at ¶6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,88,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Panayiotou pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Panayiotou, a former active-duty Marine Corps Sergeant, entered the Capitol approximately 10 minutes after its breach and passed by shattered glass while alarms were blaring.  Panayiotou then traversed the Capitol building, going to multiple floors and entering a room that was never open to the public, for approximately 39 minutes.  While still inside of the Capitol, he stood near an exterior window and appeared to beckon other rioters to enter the Capitol Building.  At one point, Panayiotou was stopped by multiple armed law enforcement officers.  Rather than immediately leave the Capitol through the first exit he saw, Panayiotou ventured into the Rotunda before finally departing.  After leaving the Capitol, he got rid of some distinctive clothing he wore on January 6 and deleted items from his cellular telephone.  Panayiotou also violated the conditions of his release in this case by testing positive for marijuana three times, once after judicial admonishment.  Panayiotou has failed to show remorse, even during a post-plea interview, for his participation in the January 6, 2021 attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transition of power, injured more than one hundred police officers, and resulted in more than two million dollars in damages.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Here, the defendant's participation in a riot that succeeded in halting the Congressional certification combined with the defendant's preparation for violence, his celebration and endorsement of the violence on that day, his lack of

remorse, and the potential for future violence renders a significant jail sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Panayiotou's conduct and behavior on January 6.

*Defendant Panayiotou's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Marcos Panayiotou traveled to Washington, D.C. to protest Congress's certification of the Electoral College.  On January 6, 2021, he attended the rally at the Ellipse and then walked towards the Capitol.  At approximately 2:13 p.m., a rioter breached the Senate Wing Doors on the West Front of the Capitol Building by jumping through a smashed-out window and over broken glass.  Panayiotou entered the U.S. Capitol via the Senate Wing Doors at approximately 2:23 p.m., a mere ten minutes after the initial breach of that area.



(*Initial breach of the area known as the Senate Wing Doors*)

Panayiotou, with a cellular telephone in his right hand, appeared to film and/or photograph his entry. While entering the U.S. Capitol, he was wearing sunglasses, a red hat bearing the inscription, "MAKE POLITICANS AFRAID AGAIN" on the front, and a dark sweatshirt with the logo for "Reparable Management Company – 1st Maintenance Battalion, Camp Pendleton, CA" on the back.  Panayiotou was once assigned to that battalion when he served in the Marines.  Additionally, as he entered, he passed by the shattered glass in the Senate Wing doors and the alarms were blaring.  *See* https://archive.org/details/XSZCZZND5mhM3LWZH between 00:00 and 00:46[2]

---

[2] Panayiotou is visible at the 00:00 second marker, with his back initially towards the camera in the center left of the screen.  He can be seen walking up the ramp towards the Senate Wing doors.  At approximately the 38 second marker, the smashed window embedded in the Senate Wing doors is visible and the alarm blaring from within is audible.  The alarm proceeds to get louder as the rioter filming entered the Capitol.



*(Panayiotou, circled in red, entering the U.S. Capitol)*



*(The back of Panayiotou's sweatshirt)*

After entering the U.S. Capitol, Panayiotou removed his sunglasses while still in the area of the Senate Wing Doors, showing his face.



(*Panayiotou after removing his sunglasses*)

From there, Panayiotou walked towards the Crypt from the Senate Wing Doors area.  He then backtracked towards the Senate Wing Doors and began filming or photographing in the direction of his fellow rioters entering the Capitol.



(*Panayiotou, circled in red, filming and/or photographing towards the rioters entering the Capitol*)

Panayiotou then walked again towards the Crypt.  Rather than going directly there, he turned right and entered S145.  S145 is only open for events and meetings and is not opened to the public during Capitol building tours.  *See* https://archive.org/details/XSZCZZND5mhM3LWZH between the 01:13 and 1:22 marker;  *See*  https://archive.org/details/CcWoDMZenyzdxzy5p between 52:35 and 52:41 marker.



(*Panayiotou, circled in red, moments after entering the conference room*)

After walking through the Crypt, Panayiotou walked to the second floor of the Capitol. While on the second floor, he climbed into the frame of an exterior window of the Capitol Building and, facing towards the outside of the building, motioned inwards with his hands multiple times, as though he was beckoning his fellow rioters outside to enter the Capitol.





(*Panayiotou, circled in red, motioning for rioters to enter the Capitol*)

Panayiotou then walked to the third floor of the Capitol, where he walked the halls around

the House Gallery, telephone in hand.



While on the third floor, he was stopped by police officers at approximately 2:47 p.m.,

who directed him to leave the area.





(*Panayiotou, circled in red, being escorted by an officer*)

Panayiotou continued down the stairs and arrived at the base of the stairs to the side of the

Rotunda Doors at approximately 2:59 p.m.  He then engaged in conversation with another rioter.



(*Panayiotou, circled in red, arriving at the base of the stairs in front of the
Rotunda Doors, circled in blue*)

Rather than exit the doors, which were immediately in front of him, Panayiotou turned around and briefly entered the Rotunda. Panayiotou ultimately left the U.S. Capitol at approximately 3:02 p.m. through the Rotunda Doors.

*Defendant Panayiotou's Post-Plea Interview*

On October 20, 2022, Panayiotou, along with his counsel, participated in a post-plea interview with the FBI pursuant to the executed plea agreement regarding his activities relating to January 6, 2021. During the interview, he stated that he decided to go to Washington, D.C. once the protests were announced. He had no particular plans for the trip but did meet with his mother and stepfather in Washington, D.C. on January 5, 2021. Panayiotou did not recognize anyone else in Washington, D.C. and did not have plans to meet with anyone else in Washington, D.C. He attended the rally with his mother and stepfather, and then decided to go towards the Capitol, where others were also headed. When asked about whether his mother and stepfather went to the Capitol, he commented that they were "smart" and did not even enter the grounds. Panayiotou claimed to not have seen any violence while at the Capitol. At one point, he opined that maybe the violence was on the other side of the building. He also claimed to not see or smell tear gas and did not see or hear flashbangs. Panayiotou also claimed that there were no police officers there and that he barely saw any of them. As discussed below, a number of statements were misleading at best.

According to Panayiotou, when he got to the building, there was a "steady stream" of people going inside and "more and more by the minute." He further described it as people were "flowing through the door like a wave of water." Panayiotou did not turn around because the "flow" was moving. He did not have a plan of where to travel within the building. Panayiotou stated he left the Capitol and went straight to his car, which was approximately half a mile away. Thereafter, he drove out of Washington, D.C.

11

While inside, he did take photos and videos, which he said were not posted to social media. Panayiotou did not retain any of the photos or videos and opined that he probably deleted them from his phone. However, he does not recall the specifics. Yet, when asked about what happened to his sweatshirt and hat, he admitted to getting rid of them. He added that there was "no secret with the manhunt." Panayiotou failed to show any remorse during his post-plea interview.

### *Panayiotou's Statement to the Court*

As noted in the PSR, Panayiotou provided a letter for the Court's consideration. In this letter, Panayiotou stated, "And as the evidence shows, I followed the crowd. I did not touch anything or anyone. My own videos of the situation prove this and those videos were shared with family and friends and ultimately, I was arrested and charged with unlawful parading and picketing." He noted this "destroyed a good portion of [his] life." Panayiotou discussed the consequences and "grief" he has suffered. Panayiotou stated he has accepted responsibility. He also stated that "I know it may sound tired and just trite but I truly thought I was following the directives of President Trump who had just delivered a speech at the Washington monument. And because of that, I truly understand the concept of herd mentality and again, apologize for my actions." Panayiotou also explained that, regarding his recent positive marijuana test result, "[t]he stress of this matter has put me over the edge[,]" which led him to smoke marijuana again.

### *The Charges and Plea Agreement*

On November 30, 2021, the United States charged Panayiotou by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On December 2, 2021, law enforcement officers arrested him at his home in New Jersey. On February 16, 2022, the United States charged Panayiotou by a four count Information for violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On August 26, 2022, pursuant to a

plea agreement, Panayiotou pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Panayiotou agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Panayiotou now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration, 36 months' probation, and $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

The D.C. Circuit has observed that "the attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).

The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Panayiotou's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Panayiotou, the absence of violent or destructive acts is not a mitigating factor. Had Panayiotou engaged in such conduct, he or she would have faced additional criminal charges.

Panayiotou, a Marine veteran who had taken an oath to protect and defend the country against all enemies, foreign and domestic, went to Washington, D.C. to protest the 2020 election results. Unlike his "smart" mother and stepfather, he made the journey from the Ellipse to the U.S. Capitol. Apparently, Panayiotou's "herd" did not include his wiser mother and stepfather. He told the FBI during his post-plea interview that he did not see any violence, see or smell tear gas, or see or hear flashbangs. He hypothesized that that sort of activity may have been on the "other side of the building" from which he entered.

That statement is highly dubious. Having traveled from the Ellipse to the West Front of the Capitol Building, he would have undoubtedly passed by, and likely through, the mob on that side to get to the Senate Wing Doors, which was his breaching point. Additionally, beginning at approximately 2:03 p.m., which is approximately 20 minutes before Panayiotou breached the Capitol, an audible dispersal order played on a continuous thirty-second loop from a nearby amplifier on the West side of the Capitol. Panayiotou entered the Capitol a mere ten minutes after the initial breach and likely saw the broken glass on the floor of the building next to the Senate Wing Door. He joined the mob of rioters who swarmed the Capitol that day. As though there

were not enough rioters plaguing the Capitol that day, at one point, Panayiotou climbed into a window frame to beckon his fellow rioters from the grounds to enter the Capitol.

While he told the FBI that he barely saw any officers, Panayiotou did encounter officers on the third floor of the Capitol.  There, he was ordered by armed officers to stop and retreat back down the Capitol.  Once he got down to an obvious exit point, the Rotunda Doors, he failed to immediately leave the building, despite his recent encounter with officers.  Rather, he entered the Rotunda briefly before exiting the Capitol after his 39-minute invasion of the sacred halls of the Capitol.

He admittedly deleted content from his cellular telephone, although he does not recall the specifics.  When asked about his distinctive sweatshirt and hat, he admitted to getting rid of those items.  When asked why, he referenced that there was "no secret with the manhunt."  As a result, he admittedly destroyed evidence of his presence at the Capitol and documentation of what he captured from inside of the Capitol in order to avoid detection by law enforcement officials and cover up his crime.

Panayiotou failed to show any signs of remorse during his post-plea interview and even suggested that maybe the violence was "on the other side" of the Capitol.  While in his letter to the Court he notes the "quite real and deep" grief he has caused, the "family, friends, acquaintances, job opportunities, and military brothers" he has lost, that he regrets the "hurt and shame my conduct has caused others and my own[,]" and that the "stress and pain my actions have caused all and myself have no words."  It appears that the only true remorse Panayiotou has expressed in his letter to the Court is the remorse for how his actions impacted himself, primarily, as well as the impact on his loved ones.  It appears that he also only expressed remorse for the effects of his arrest on his life, not the actions that lead to his arrest.  Further, he has failed to show remorse for how his

actions supported the larger mobs' violent and vicious attack on law enforcement officers, the destruction caused onto the Capitol building, and the attack directed at the core of our democratic society. Notably, he does not even acknowledge that these things occurred on January 6, 2021. Further, he attempted to push blame for his own choices and actions to the "herd" he was a part of in an attempt to minimize his own responsibility for his own actions that day. Panayiotou has consistently failed to show remorse for what his actions caused on January 6th aside for the remorse on his own life.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Panayiotou

As set forth in the PSR, Panayiotou also self-reported to the PSR interview that he was in the United States Marine Corps from 2016 to 2020, where he separated with the rank of Sergeant. While Panayiotou's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Panayiotou should have been well aware that a person does not have the right to enter restricted government buildings due to a dissatisfaction in election results. His voluntary decision to storm a guarded government building is nothing short of shocking in light of his former military service and training.

Additionally, as noted by the PSR, one condition of the defendant's release condition is to refrain from marijuana use. However, the defendant tested positive for marijuana use on December 7, 2021 and February 10, 2022. During the March 16, 2022 hearing, the Court admonished the defendant for his two positive marijuana results and violation of the terms of his release. Yet, the defendant tested positive again for marijuana use on September 30, 2022, when Panayiotou was pending sentencing.

On December 2, 2021, during the execution of the warrant for Panayiotou's arrest and warrant for the search of his residence, law enforcement officers observed a H7K VP9 handgun on the nightstand next to Panayiotou's bed.  The handgun had a high-capacity, seventeen round magazine containing fourteen rounds.  Panayiotou was then charged with a violation of N.J.S.A. 2C:39-3J.  Panayiotou was later convicted of Disorderly Conduct.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others?  Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted above, Panayiotou, a Marine veteran entered the Capitol despite passing shattered glass and hearing the alarms blaring overhead and proceeded to invade multiple floors of the Capitol before being stopped by armed officers. Rather than leave the Capitol once he descended the Capitol towards an exit point, he went into the Rotunda momentarily. If his experience within the Marine Corps did not provide sufficient deterrence that he, along with his fellow rioters, are not allowed to breach and swarm the U.S. Capitol building, then surely being stopped by multiple armed officers, and directed to exit the upper Capitol building with his hands in the air should have been a strong indicator that Panayiotou should leave immediately. Apparently, even armed officers could not expeditiously rid the Capitol of Panayiotou. Even during his October 2022 post-plea interview, which occurred almost two years since January 6, 2021 and almost a year since his arrest in this case, Panayiotou failed to express remorse for his actions on January 6, 2021. Rather, he made claimed that it was just a "flow" of people he was following, he "barely saw officers," and that "maybe the violence was on the other side of the building." These preposterous claims fly in the face of what occurred on the Capitol grounds and in the building on January 6, 2021.

After leaving the Capitol, Panayiotou destroyed evidence, getting rid of his distinctive hat and outerwear and deleted items from his telephone because of the "manhunt" for the January 6th rioters.

As part of his pretrial release, Panayiotou was ordered to refrain from prohibited substances, which includes marijuana. Yet, while on release, Panayiotou has failed a marijuana

test three times.  The most recent violation occurred on September 30, 2022, which is both after judicial admonishment for his prior violations and while he was pending sentencing on this matter. If Panayiotou is unable to abide by the terms of his release while he is pending sentence, which is when one would likely be on their best behavior, then Panayiotou appears to fail to give this case and this Court's order its due weight.  This failure to abide by Court orders and his statements during his October 2022 post-plea interview further calls into question whether he would repeat his mistakes and engage in the same type of conduct if circumstances like the Capitol riot were to arise again.  The need to send a message that Panayiotou cannot simply turn a blind eye to his and his fellow rioters' actions on January 6, 2021 and ignore the law warrants a serious sentence in this case

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Panayiotou based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Panayiotou has pleaded guilty to Count Four of the Information, charging him with violating 40 U.S.C. §5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a).  Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).  "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences."  Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.*  Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years.  For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences.  The statutory range of for a petty offense is zero to six months.  Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom.  *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jennifer Heinl*, 21-cr-370 (EGS), the defendant entered the Capitol a few minutes before Panayiotou and through the same doors. She claimed she entered the Capitol out of fear for her safety and then remained in the Capitol for approximately 45 minutes before exiting the Rotunda Doors, the same doors Panayiotou exited. During a pre-arrest interview, Heinl admitted to gong to the Capitol but provided false information about her associate, who traveled with her. Similar to Panayiotou, Heinl failed to show remorse for her actions on January 6, 2021. Heinl pled guilty to violating 40 U.S.C. §5104(e)(2)(G). The government recommended a sentence of 14 days' incarceration followed 36 months of probation and the Court sentenced Heinl to 14 days' intermittent incarceration along with 36 months of probation.

In *United States v. Jeremy Ryan Sorvisto,* 21-cr-320 (ABJ), the defendant entered the Capitol through the same doors, and couple of minutes after Panayiotou. Based on the timing of his entry, Sorvisto likely saw violence being committed before his entry. Sorvisto, like Panayiotou, walked to the Crypt and stayed in the Capitol for approximately twenty-five minutes. Sorvisto took a selfie while inside of the Capitol and also used another person's Facebook account to report they were being "gass[ed]." While in the Capitol, Sorvisto picked up some litter and left the Capitol when instructed to do so by police. After leaving the Capitol, Sorvisto instructed another person to delete photographs of him inside the Capitol and, like Panayiotou, discarded his jacket. Sorvisto did not show remorse for his conduct, nor did he admit his unlawful conduct to law enforcement officials even after his associate was arrested and charged. Sorvisto pled guilty to violating 40 U.S.C. §5104(e)(2)(G). The Court sentenced Sorvisto to 30 days' incarceration and $500 in restitution, the sentence recommended by the government.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    This Court's Authority to Impose a Sentence of Incarceration and Probation

As nine judges of this District have now concluded, this Court has the authority under 18 U.S.C. § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*,

21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same); *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022).

A sentencing court may impose a "split sentence" - "a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21cr315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same): *United States v. Ferreira*, 22cr210 (TSC) (D.D.C.

October 6, 2022) (same).[5]  In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

A.     **A sentence imposed for a petty offense may include both incarceration and probation.**

1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions - one from subchapter A and one from subchapter B - are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[6] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be

---

[5] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G).  Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

[6] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[7] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation

---

[7] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

2. ***Analysis***

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at \*4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific

provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could

be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Panayiotou pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

B. **A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[8]

## 2.  *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862,

at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

and reversing magistrate's sentence that included 30-day period of confinement as a condition of

probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18,

2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation

was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous

60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of

up to two weeks' imprisonment served in one continuous term followed by a period of probation

is permissible under Section 3563(b)(10).[9]

---

[8] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

[9] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Panayiotou to 45 days' incarceration followed by 36 months' probation and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

> Respectfully submitted,
> MATTHEW M. GRAVES
> United States Attorney
>
> By:    /s/ *Maria Y. Fedor*
>        MARIA Y. FEDOR
>        Attorney, detailed to the
>        United States Attorney's Office for the
>        District of Columbia
>        D.C. Bar No. 985823
>        601 D Street, N.W.
>        Washington, DC 20530
>        Maria.Fedor@usdoj.gov